John M. PARK

v.

FORD MOTOR COMPANY.

No. 2002–575–Appeal.

Supreme Court of Rhode Island.

Feb. 13, 2004.

Christopher M. Lefebvre, Pawtucket, for Plaintiff.

Brian Anderson (non RI), for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

PER CURIAM.

The plaintiff, John M. Park (Park), appeals from a Superior Court judgment dismissing his complaint for compensatory damages, injunctive relief, and class certification because Ford Motor Company (Ford) failed to provide him with a "SecuriLock" system on a Ford Ranger truck that he purchased from Rizzo Ford, Inc. (Rizzo Ford). The hearing justice dismissed the complaint for lack of subject-

matter jurisdiction under G.L.1956 § 8–2–14.

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and examining the record and the memoranda filed by the parties, we are of the opinion that cause has not been shown, and proceed to decide the appeal at this time. We reverse the judgment of the Superior Court and remand the record in this case for further proceedings in line with this opinion.

## Facts and Travel

On January 26, 2001, Park purchased a new 2001 Ford Ranger 2.5L pickup truck from Rizzo Ford in North Providence, Rhode Island. The Monroney window sticker on the truck listed the "Securi-Lock" antitheft system as a standard feature. The Monroney sticker is a federally required window sticker that lists the model of the vehicle, the manufacturer's suggested retail price, the equipment it contains, and its fuel economy ratings. Park claims that his decision to purchase the 2001 Ranger was based, in part, on the inclusion of the antitheft system as a standard feature. Since 1997, SecuriLock has been provided as standard equipment on most Ford vehicles, and has been available as an option for about $100 on other vehicles. The SecuriLock antitheft system consists of a computer chip embedded in the automobile key. The chip is programmed with one of 72 billion codes. A vehicle equipped with SecuriLock will not operate unless an electronic module inside the engine recognizes the correct code.

One day after he bought the Ranger, Park noticed that no dashboard light came on when he attempted to activate the system. Park took his truck back to Rizzo

Ford and discovered that his Ford Ranger was not equipped with the SecuriLock system. Park complained about the missing system to Rizzo Ford's service department and manager. He was told that an area representative would contact him about the problem. He was not contacted. Upon complaining to Rizzo Ford's service manager again, Park was told that he should have received a letter offering an oil change as compensation. Park had not received that letter, however. Park then lodged a complaint with the Ford Motor Company customer service hot line. Ford blamed the problem on Rizzo Ford. Predictably, Rizzo Ford blamed Ford Motor Company for the mistake. Subsequently, on March 19, 2001, the sales department at Rizzo Ford explained that the area representative had made a decision to offer Park a free oil change as compensation for the mistake.

On March 23, 2001, Ford contacted Park to acknowledge that there was a misprint on the window sticker and the Ranger was not designated to be equipped with SecuriLock. On January 12, 2001, before Park purchased the Ranger, Ford issued a form letter to all retail dealers explaining that "[p]rinted materials, including the vehicle MSRP Window Label, incorrectly stated that standard equipment for the 2001 Rangers equipped with a 2.5L I4 engine included the SecuriLock feature. * * * These vehicles are *not* equipped with this feature." The letter further explained that all owners of the 2001 Ranger with a 2.5L I4 engine "will receive a free oil and filter change certificate."

On April 17, 2001, a Rizzo Ford representative informed Park that, indeed, there was no SecuriLock in his Ranger, and offered Park $200 toward a different security system. Rizzo also offered Park a free filter and oil change. Rizzo further informed Park that it would be unable to

retrofit the Ranger with the SecuriLock system. Park rejected Rizzo's offer to install a comparable security system along with Ford's offer of a filter and an oil change.

Park filed suit against Ford on May 17, 2001, seeking compensatory and injunctive relief. In his second amended complaint, Park alleges violation of the Magnuson Moss Consumer Products Warranty Act (Magnuson Moss Act), 15 U.S.C. § 2310, breach of implied warranty under § 2–314(2)(f) of the Uniform Commercial Code, breach of express warranty under § 2–313 of the Uniform Commercial Code, and consumer fraud under § 3 of the Michigan Consumer Protection Act, *Mich. Comp. Laws Ann.*, §§ 445.901 through 445.922 (West 2002) and G.L. 1956 chapter 13.1 of title 6, the Rhode Island Deceptive Trade Practices Act (DTPA or the act).

Park's complaint also seeks class certification pursuant to Rule 23(a)(b)(3) of the Superior Court Rules of Civil Procedure. With respect to the alleged violations of the Magnuson Moss Act, he seeks to represent all persons in the United States who purchased a vehicle from Ford on or after a date four years before this action was filed that left the manufacturing plant with a Monroney sticker, stating that the vehicle was equipped with a SecuriLock system, but in fact was not. With respect to the alleged breach of express and implied warranties under the Uniform Commercial Code, he seeks to represent a proposed class consisting of all people in the United States, excluding Arizona and Idaho, who purchased any new Ford vehicle within four years prior to the filing of the action, which vehicle left the manufacturing plant with a Monroney sticker stating that it was equipped with a SecuriLock system, when in fact it was not, and when the sticker had not been replaced with a sticker so indicating. Finally, with respect to the Michigan and Rhode Island consumer fraud claims, Park seeks to represent a proposed national class of similarly situated consumer purchasers of Ford vehicles whose purchases occurred on or after a date six years before this action was filed. He also seeks to certify a subclass of Rhode Island residents who satisfy the above criteria.

Park also filed a motion for class certification pursuant to Rule 23, to which Ford objected. On August 28, 2002, the hearing justice issued a written decision, from which Park timely appealed.

## Discussion

The hearing justice dismissed *sua sponte* Park's claims for damages pursuant to § 8–2–14 for failure to plead the jurisdictional minimum of $5,000. Moreover, finding no basis for injunctive relief, he ruled that the Superior Court did not have subject-matter jurisdiction pursuant to § 8–2–13. Section 8–2–14(a) gives the Superior Court original jurisdiction in all actions of law "in which the amount in controversy shall exceed the sum of ten thousand dollars ($10,000); and shall also have concurrent original jurisdiction with the district court in all other actions at law in which the amount in controversy exceeds the sum of five thousand dollars ($5,000) * * *." The SecuriLock system is valued at less than $200. The hearing justice determined that Ford's failure to include the feature in its standard package alone would not confer jurisdiction on the Superior Court because the purported class claims were divisible, and as such did not meet the minimum jurisdictional amount when the claims were taken separately.

The hearing justice based his decision on this Court's ruling in *Carvalho v. Coletta*, 457 A.2d 614 (R.I.1983). In that case, we adopted the United States Supreme

Court's standard concerning the aggregation of individual claims in a class action. *Id.* at 616 (citing *Pinel v. Pinel*, 240 U.S. 594, 596, 36 S.Ct. 416, 60 L.Ed. 817 (1916)). In accord with the United States Supreme Court, we announced that "when two or more plaintiffs having separate and distinct claims unite in a single suit, each demand must meet the jurisdictional amount." *Carvalho*, 457 A.2d at 616. This Court in *Carvalho* dismissed an attempted class action for lack of subject-matter jurisdiction when a car owner attempted to join his claim for conversion with other car owners who had their cars towed by a towing company. *Id.* at 615–16. We ruled that each member of the purported class "would have a distinct claim against defendant for towing their cars making aggregation inappropriate." *Id.* at 616. Furthermore, the Superior Court did not have jurisdiction to hear the case once the claims were severed because the class representative did not have a claim that met the jurisdictional amount. *Id.*

In the present case, the hearing justice found that each individual claim was divisible "because each vehicle purchase represent[ed] separate rights reserved for each customer." He concluded, "[t]he customers do not share one common right against Ford." Thus, in order for [the Superior Court] to maintain subject-matter jurisdiction over the proposed class action, each individual member of the class must have a claim for at least $5,000 against Ford." In this case, Park conceded that the compensatory damages for each potential class member were no more than $200.

Next, the hearing justice found no basis for plaintiff's prayer for injunctive relief. The Superior Court has exclusive jurisdiction over issues of equity, such as issuing an injunction, under § 8–2–13. The hearing justice found that "there [was] an adequate remedy at law to compensate the proposed class members for their damages in this case." Furthermore, the hearing justice found that there was no need to enjoin Ford from continuing to sell vehicles with defective window stickers because plaintiff did not allege that Ford continued to sell vehicles with defective stickers after it discovered the problem. Thus, Park failed to satisfy the requirements of Rule 23(b)(2) by showing that "[t]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

The hearing justice correctly considered the effect that *Carvalho* would have on plaintiff's attempt to represent a class in which the claims are divisible. *See Carvalho*, 457 A.2d at 616. In this case, if the individual consumer claims for $200 are divisible, then they could not be aggregated to reach the jurisdictional amount necessary to maintain the action in Superior Court. *See id.* We conclude, however, that the hearing justice failed to consider the viability of Park's consumer fraud claim under the DTPA.

The hearing justice failed properly to consider this count of the complaint and the effect it would have on the question of jurisdiction. The Superior Court does have jurisdiction to hear plaintiff's case under § 6–13.1–5.2, which provides in pertinent part:

"**Private and class actions.**—(a) Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by § 6–13.1–2, may

bring an action under Rules of Civil Procedure in the superior court of the county in which the seller or lessor resides, is found, has his or her principal place of business, or is doing business, or in the superior court of the county as is otherwise provided by law, to recover actual damages or two hundred dollars ($200), whichever is greater. The court may, in its discretion, award punitive damages and may provide other equitable relief that it deems necessary or proper.

"(b) Persons entitled to bring an action under subsection (a) of this section may, if the unlawful method, act, or practice has caused similar injury to numerous other persons similarly situated and if they adequately represent the similarly situated persons, bring an action on behalf of themselves and other similarly injured and situated persons to recover damages as provided for in subsection (a) of this section. In any action brought under this section, the court may in its discretion order, in addition to damages, injunctive or other equitable relief."

As the DTPA makes clear, violations of the act that result in "*any* ascertainable loss of money or property" may be remedied by means of a class action by those who suffer common injury. *Id.* (Emphasis added.) Furthermore, those injured by a deceptive trade practice need not meet the general amount in controversy necessary to bring civil actions in Superior Court under § 8–2–14. *See* § 6–13.1–5.2. Section 6–13.1–5.2(a) provides for recoveries of at least $200 or the plaintiff's actual damages, whichever is greater. The Superior Court may also order injunctive or other equitable relief if necessary. *Id.*

Ford argues that § 6–13.1–5.2(a) does not vest the Superior Court with jurisdiction to hear all cases alleging deceptive

trade practices, but only "provides a private right of action and identifies the types of relief available to the successful * * * plaintiff." It argues that, regardless of the claims asserted in the suit, the amount in controversy must exceed $5,000 for the Superior Court to have jurisdiction. We find the argument unpersuasive.

 We review questions of statutory interpretation *de novo.* *Direct Action for Rights and Equality v. Gannon,* 819 A.2d 651, 659 (R.I.2003) (citing *Pier House Inn, Inc. v. 421 Corporation, Inc.,* 812 A.2d 799, 804 (R.I.2002)). "When a statute is clear and unambiguous, we adopt its plain and ordinary meaning." *Id.* Statutory construction is a holistic enterprise, however. We do not " 'interpret a legislative enactment literally when to do so would provide a result at odds with its legislative intent.' " *Providence Journal Co. v. Rodgers,* 711 A.2d 1131, 1134 (R.I.1998). Rather, "[i]t is our task 'in interpreting a legislative enactment to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes.' " *Dias v. Cinquegrana,* 727 A.2d 198, 199–200 (R.I.1999) (per curiam) (quoting *Brennan v. Kirby,* 529 A.2d 633, 637 (R.I.1987)).

 It is clear that in enacting the DTPA, the Legislature intended to declare unlawful a broad variety of activities that are unfair or deceptive, as well as to provide a remedy to consumers who have sustained financial losses as a result of such activities. Section 6–13.1–1(5) lists nineteen specific and general acts or practices under the definition of "[u]nfair methods of competition and unfair or deceptive acts or practices." It is evident, even from a cursory reading of these activities, that they are meant to encompass trade practices involving goods or services having a value far less than $5,000.

Section 6–13.1–5(a)[1] permits the attorney general to bring an action in Superior Court in the public interest to restrain an unlawful method, act, or practice. As noted above § 6–13.1–5.2(a) provides a private right of action to any person who suffers "any ascertainable loss" as the result of an illegal act or practice. And § 6–13.1–5.2(b) enables such an injured person to represent a class of similarly injured persons.

■ We find no ambiguity in the language of § 6–13.1–5.2(a). It "provides a private right of action to recover actual and punitive damages and equitable relief for violations of its provisions." *Chavers v. Fleet Bank (RI), N.A.*, 844 A.2d 666, 670, 2004 WL 249605 at *3 (R.I., filed February 11, 2004). By its plain and ordinary meaning, it permits a person who sustains any loss capable of measurement, no matter how large or small, as a result of an unlawful trade practice to file suit in Superior Court. Section 6–13.1–5.2(a).

■ Section 6–13.1–5.2(a) also provides that the injured consumer will receive "actual damages or two hundred dollars ($200), whichever is greater." Thus, even if damages are nominal, the recovery will be $200. In terms of the DTPA's scope, we conclude that the Legislature intended that the Superior Court serve as the adversarial forum for contested trade practices that are not otherwise regulated by "the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States." Section 6–13.1–4.[2]

■ The provisions of the DTPA evince an intent to forego the general jurisdictional amount for Superior Court to facilitate joining claims when other claimants are similarly injured. Section 6–13.1–5.2(a). The statute is clear that claims for damages stemming from a deceptive trade practice, either individually or in the aggregate, need not reach the $5,000 jurisdictional threshold of § 8–2–14. *Id.* We see nothing ambiguous in the text of § 6–13.1–5.2(a) or (b) that would indicate otherwise than that the Superior Court has jurisdiction to hear all cases or class actions that allege "any ascertainable loss" suffered as a result of unlawful trade practices under § 6–13.1–2.

Ford argues that the $200 damage award in § 6–13.1–5.2(a) serves only as a default award in cases in which plaintiff pleads damages of $5,000 or more, prevails in Superior Court, and "can only prove up compensatory damages in some amount less than $200." Furthermore, Ford asserts that this scheme of relief takes effect only "if the court properly has jurisdiction * * * in the first place." Consequently, "a plaintiff must seek relief having a value in excess of $5,000." Ford further asserts

---

1. General Laws 1956 § 6–13.1–5(a) provides:

"**Restraining prohibited acts.**—(a) Whenever the attorney general has reason to believe that any person is using, has used, or is about to use any method, act, or practice declared to be unlawful by § 6–13.1–2, and that proceedings would be in the public interest, the attorney general may bring an action in the name of the state against the person to restrain by temporary or permanent injunction the use of the method, act, or practice, upon the giving of appropriate notice to that person. The notice must generally state the relief sought and be served in accordance with § 6–13.1–7 and at least three (3) days before the hearing of the action."

2. Section 6–13.1–4 provides:

"**Exemptions.**—Nothing in this chapter shall apply to actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States."

that plaintiff does not and cannot point to anything in the statutory scheme that abrogates the amount in controversy requirement. Ford is correct that plaintiff cannot point to a provision in the DTPA that explicitly abrogates the amount in controversy requirement except, of course, for the plain wording of § 6–13.1–5.2(a). Rather than creating some formalistic pleading requirement to meet the jurisdictional demands of § 8–2–14, the Legislature created a private right of action for all violations of the DTPA, regardless of the amount in controversy, to be heard in Superior Court. *Compare* § 6–13.1–5.2 *with* G.L.1956 § 6–36–10(a) (the Rhode Island Antitrust Act specifically provides that Superior Court has jurisdiction to "prevent and restrain violations of this chapter, provided that the statutory minimum amount in controversy is properly present").

We are faced, therefore, with an apparent statutory conflict between § 6–13.1–5.2, which permits a person who suffers any ascertainable loss because of an unlawful trade practice to file suit in Superior Court and § 8–2–14, which denies access to litigants when the amount in controversy is less than $5,000. The Legislature has provided guidance in this area. General Laws 1956 § 43–3–26 provides as follows:

> "**Conflicting general and special provisions.**—Wherever a general provision shall be in conflict with a special provision relating to the same or a similar subject, the two (2) provisions shall be construed, if possible, so that effect may be given to both; and in those cases, if effect cannot be given to both, the special provision shall prevail and shall be construed as an exception to the general provision."

The Legislature's instructions are clear. We must first attempt to construe the two provisions to give effect to both. "The clear preference is for the court to construe the statutes so that both may be given effect." *Rhode Island Higher Education Assistance Authority v. Rhode Island Conflict of Interest Commission,* 505 A.2d 427, 430 (R.I.1986). "[E]very attempt should be made to construe and apply them so as to avoid the inconsistency * * *." *Asadoorian v. Warwick School Committee,* 691 A.2d 573, 580 (R.I. 1997) (quoting *Brennan,* 529 A.2d at 637).

When, however, the two provisions are irreconcilable and cannot both be given effect, the specific legislation prevails and is to be construed as an exception to the more general legislation. Here, the "any ascertainable loss" language of DTPA's § 6–13.1–5.2(a) trumps the "amount in controversy" threshold set forth in the general jurisdictional provisions of § 8–2–14(a).

## Conclusion

We conclude, therefore, that the class claims under the DTPA should be allowed to proceed in Superior Court, and that the hearing justice erred by dismissing the plaintiff's complaint for want of subject-matter jurisdiction. We reverse the judgment, and remand the papers in this case to the Superior Court for further proceedings.