**In re Anthony TAVARES.**

No. 2002–604–M.P.

Supreme Court of Rhode Island.

Nov. 14, 2005.

Sue Ellen M. Dunn, Cranston, for Petitioner.

Catherine A. Gibran, Providence, for Respondent.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

A challenge to the authority of a Superior Court justice to continue a forensic commitment to ensure that a criminal defendant remains competent brings this matter before the Court. The petitioner, the Department of Mental Health, Retardation and Hospitals (MHRH or department), contends that the hearing justice improperly ordered the respondent, Anthony Tavares, to remain committed at MHRH's forensic unit after an examining physician made a finding of competency.

In November 2001, Tavares was arrested for the murder of his social worker, Glen Hayes. Shortly thereafter, a competency evaluation ordered by a judge of the District Court determined that Tavares was not competent to stand trial. Pursuant to G.L. 1956 § 40.1-5.3-3, Tavares was transferred to the forensic unit at Eleanor Slater Hospital (ESH) for the purpose of restoring his competency.[1] After an extended period of intensive treatment, Tavares' counsel and counsel for the state stipulated to the admission into evidence of a medical report concluding that Tavares had been restored to competency. The hearing justice nonetheless ordered him to remain at the forensic unit because the justice was concerned that he would decompensate before or during his trial if he was returned to prison.

MHRH argues that the hearing justice erred when he ordered Tavares' commitment to continue after his competency was restored, contending that § 40.1-5.3-3 of the forensic statute compels the immediate termination of commitment upon a finding of competency, and that judges do not have discretion to order otherwise. On October 11, 2002, MHRH petitioned for certiorari. This Court granted certiorari on May 22, 2003. For the reasons set forth herein, we affirm the order of the Superior Court.

## I

### Facts and Procedural History[2]

#### A. The Murder of Glen Hayes

Anthony Tavares is a deeply troubled man. Over the years, he has been hospitalized many times for serious mental illness, including schizophrenia, and he frequently has been in trouble with the law, sometimes for acts of violence. By November 9, 2001, Tavares' ability to distinguish his delusions from reality had nearly vanished.

On that fateful day, Glen Hayes, a substance abuse specialist, and Victor Moniz, a psychiatric nurse, visited Tavares in connection with their employment at Johnston Mental Health Services. The two mental health professionals went to Tavares' home

---

1. General Laws 1956 § 40.1-5.3-1 requires the director of MHRH to maintain "an appropriate facility" for persons who are forensically committed. For ease of reference in this opinion, we will refer to this facility as the "forensic unit" or "ESH." We will also refer

to §§ 40.1-5.3-1 through 40.1-5.3-18 collectively as the "forensic statute."

2. We have gleaned the facts from both the record of the competency hearing and the trial of this matter, at which Tavares was found not guilty by reason of insanity.

to deliver his medication. In advance of their arrival, Moniz called Tavares to let him know they were coming. Tavares asked whether they had "called the cops" on him, and then mumbled something unintelligible and hung up. Concerned, Moniz called back; Tavares told them to come by, but asked them to hurry, because he "had something to do."

Around 5 p.m., Hayes and Moniz arrived at the Evergreen Apartments in Cranston, Rhode Island, where Tavares lived with his mother. A smiling and genial Tavares answered the doorbell and told the two workers that he was doing well. After some small talk, Moniz proffered Tavares his medication, which he accepted. Ominously, however, Tavares explained that he took the medication only when he felt that he needed it.

Tavares invited them up to his apartment to sit and talk for a while. Although they had delivered medications to Tavares before, he had never invited them in to visit. Moniz asked if anyone else was home, and Tavares responded affirmatively. Still, Moniz felt "a little leery" as they followed Tavares upstairs to the apartment. He turned to Hayes and asked him if he was comfortable going into Tavares' apartment, and Hayes indicated that he was.

Once inside, the three men sat in the living room. Hayes sat next to Tavares, and Moniz, who was still wary, purposely chose a seat near the door. As they talked, the conversation grew increasingly bizarre. Tavares asked the men whether they could lend him some money, and when they told him that they could not, he asked how much money they had. Moniz grew alarmed by Tavares' aggressive tone, and he tried to change the subject of the conversation. Tavares asked the men if they would pray to Satan with him, and they declined. He asked Hayes if he prayed to God. "Sometimes," Hayes replied. Again, an apprehensive Moniz tried to change the course of discussion.

While the men were talking, Tavares' mother, who had been in the kitchen, came into the living room. She noticed that her son was smoking and flicking his ashes onto the floor, and she calmly asked him to smoke outside, a request that he angrily refused. She returned to the kitchen and the men resumed their talk.

When it appeared that the agitated Tavares had calmed down, Hayes arose from the couch and indicated that it was time for him and Moniz to leave. Without any warning, Tavares jumped up from the couch and shouted, "where do you think you're going!" He violently pushed Hayes, and Moniz noticed that in his right hand he held an eight-inch serrated knife. Moniz made a vain effort to restrain Tavares, but he was unable to prevent him from violently stabbing Hayes just above the left eyebrow.[3] Tavares then struck Moniz with his fist, knocking him backwards into a wall.

Tavares' mother heard the commotion and rushed into the room. She saw Hayes lying on the floor and screamed, "Anthony! Anthony! What have you done!" With Tavares distracted by her yelling, Moniz jumped to his feet, fled down the stairs and ran outside. He hid behind a row of bushes and waited to see if Tavares had followed him. He then ran to a neighbor's house and asked her to call 911. By the time the police arrived, however, Tavares had fled the scene. Hayes was rushed to the hospital with the knife still protruding

3. The force of the blow was sufficient to lodge the knife approximately seven inches into Hayes' skull.

from his forehead, but he was later pronounced dead from his wounds.

Tavares would explain later that he killed Hayes because Hayes had "broken into his mind." He said that he thought Hayes and Moniz were working for Satan, and that they were at his home either to rape his mother or to force him to rape his mother. At the time of the murder, he thought Hayes was already dead—a "walking dead"—and that he had to stab Hayes to defend himself. Tavares also reported that after he fled the murder scene, but before he was arrested, he drove to the shore. He sat on the beach and prayed with a rosary. He added that, when he looked up at the sky, he saw God, poised with a knife and ready to kill him.

### B. Tavares' Personal History

Anthony Tavares' life story is tragic indeed. He was born in 1979, the middle child of three. His older sister, who died in a car accident in 1994, chronically abused him, and was herself treated several times for mental illness. His father, who is schizophrenic, committed murder by stabbing a man with an ice pick.[4]

Tavares first began to show signs of mental illness when he was only four years old. His mother sought treatment for him because she "had a multitude of complaints about his behavior." By age six, he was admitted to his first psychiatric treatment program, and he was expelled from mainstream education in the first grade. Throughout his childhood, he was continually shuffled between special schools, residential care facilities, juvenile detention, and hospitals. According to Tavares, "[t]hey used to try to put me everywhere * * *. They used to say I was mental."

As a child, Tavares was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), but he did not take his medication. His behavior, and his mental health, never improved, but worsened with time. By age eleven, he began to suffer paranoid and delusional symptoms. He also grew more violent; as a young teen, he was charged with assault on several occasions, had threatened to kill a boy, and had threatened people with knives. Throughout adolescence, Tavares continued to deteriorate. His history during that period of his life includes suicide attempts, arson, and assault, as well as several psychiatric hospitalizations.

Tragically, Tavares fared no better as he grew into adulthood. He was diagnosed with schizophrenia at age nineteen. Early in 2000, he was involuntarily hospitalized due to audio and visual hallucinations of animals killing each other, paranoia, and a belief that the devil was stalking him. Tavares' condition improved with medication, and he was discharged with a diagnosis of chronic paranoid schizophrenia. Later that year, however, he reported to his doctor that the television was talking to him, that he had figured out how to clone people, and that people were trying to genetically alter him.

When Tavares was hospitalized again a year later, he still was suffering from hallucinations. He told one of his doctors that he "was being raped and mugged by God, the mob and doctors," and that "the devil invaded his body." He also believed that his thoughts and feelings were being reported over the radio. Again, Tavares' symptoms improved with medication, and he was discharged with a diagnosis of chronic paranoid schizophrenia.

In the weeks preceding the murder of Hayes, Tavares had stopped taking his medication, and his mental health was rapidly declining. People who knew him said

4. Tavares reported meeting his father for the first time while both were in prison.

that he had become highly agitated, that he talked to the television, and sometimes just stared into space. He thought he was being watched, and complained of voices in his head. He would wave his hands in the air and yell "get out of here!" He believed that devils were telling him to do things, so he sought out an exorcism and wanted to build a church to keep the devils away.

## C. The Present Action

On November 10, 2001, Tavares was arrested and charged with the murder of Glen Hayes and eluding arrest, and he was held without bail at the Adult Correctional Institutions (ACI). Because he was acting strangely, ACI staff placed him in a psychiatric observation cell. On November 11, 2001, an ACI staff psychologist reported that Tavares was experiencing hallucinations and having "delusions of a religious and paranoid nature." Tavares assaulted other inmates and said that he was possessed by the devil. He further claimed that the government had taken and killed his child on Halloween, and that the child had been replaced with an exact opposite or duplicate. He also said that he "had a personal relationship with Carl Jung," and that "they talked through a book, through osmosis."[5] Significantly, and despite his unstable condition, Tavares refused all medications.

On November 14, 2001, Dr. Barry Wall, the director of forensic services at ESH, evaluated Tavares pursuant to a court order and reported that he was not competent to stand trial. Doctor Wall noted that Tavares "suffers from chronic psychotic illness (loss of contact with reality) characterized by auditory hallucinations and paranoid delusions of a religious nature." In accordance with § 40.1–5.3–3(d)(3), Ta-

vares was immediately transferred to the forensic unit at ESH.

When Tavares arrived at ESH, he assaulted a social worker and was placed on both a "four point physical restraint" and chemical restraints. On November 16, 2001, Dr. Mustafa Surti, a staff psychiatrist at ESH, successfully petitioned the court for instructions to treat Tavares with psychotropic medications without his consent because he refused to take his medication. Doctor Surti explained that, without medication, Tavares would decompensate within a day or two, and that other patients and staff would be at risk. Importantly, the doctor also noted that each time a schizophrenic patient decompensates, he becomes even more psychotic and recovery becomes more difficult.

Relying on Dr. Wall's report dated November 14, 2001, the District Court ruled that Tavares was incompetent to stand trial. Pursuant to § 40.1–5.3–3(h) of the forensic statute, the court committed Tavares to the custody of MHRH. In a report dated December 17, 2001, Dr. Wall stated that Tavares' unsupervised presence in the community was likely to imperil the peace and safety of the people, and that Tavares' treatment needs would be met best by MHRH. Doctor Wall's report notes that Tavares claimed he was "getting bothered by the f——ing devil," and that the flesh of other patients was dirty, that their skin stuck together, and moved in ways that affected him. The report further noted that Tavares was paranoid, and believed that people were brainwashing him. Hospital staff observed him responding to voices, and speaking of both God and the devil. He consistently refused medication, and believed that his orange pills would give him AIDS. Significantly,

---

5. Carl Jung is a well-known Swiss psychologist who died in 1961. Ironically, Jung once noted that "[t]he pendulum of the mind alter-

nates between sense and nonsense, not between right and wrong."

the report further explained that, "[w]ith continued treatment and antipsychotic medication and mood stabilizing medications * * *, the frequency and intensity of his hallucinations have improved."

Because of Tavares' unstable condition and his history of violence, as well as his physical size and martial arts training, workers at the hospital kept Tavares under constant supervision. His regimen of medications included heavy doses of psychotropic drugs.[6] Slowly, and aided by the administration of these court-ordered medications, Tavares' condition began to improve.

In a subsequent report, dated May 17, 2002, Dr. Wall opined that Tavares was competent to stand trial.[7] The psychiatrist's report noted that Tavares still believed that people around him were acting on forces related to the devil, but that he no longer wanted to harm them. The report further stated that Tavares "continues to see some visual hallucinations: 'I'll see boots. Cop coots, weird things.' He sees these images daily." Despite these problems, Dr. Wall reported that Tavares' symptoms of psychosis had significantly improved, and that he was "no longer actively responding to these hallucinations." With Dr. Wall's latest report in hand, MHRH petitioned the Superior Court to review Tavares' commitment to the forensic unit.

However, a testimonial hearing on Tavares' competency did not follow. Instead, his attorney and the prosecutor agreed, based on Dr. Wall's report, that Tavares was competent to stand trial. Importantly, they further stipulated that for Tavares to remain competent, it was necessary for him to remain at ESH, because he probably would decompensate if he returned to the ACI. MHRH agreed that Tavares was competent, but objected to his continued hospitalization at ESH, arguing that the forensic statute mandated a termination of his commitment.[8]

On September 27, 2002, the hearing justice held that, despite Tavares' current competency, he should remain at ESH to ensure that he retained his competency throughout the course of his trial. Although he acknowledged that § 40.1–5.3–3(i)(3)(i) of the forensic statute provides that a defendant's commitment to ESH "shall terminate" when a court determines that a defendant is competent, the hearing justice rejected MHRH's position that this provision required Tavares' immediate discharge. The hearing justice explained that, as a whole, the forensic statute demonstrated a legislative intent to allow for judicial discretion. Because competency should consist of more than just a momentary condition, the hearing justice reasoned that he had a duty to ensure that Tavares remained competent throughout his trial. The court further explained that "[t]he defendant's competency was restored, and is currently maintained, through both the environment and the care of the mental health professionals at ESH."

On May 22, 2003, this Court granted MHRH's petition for certiorari. The de-

---

6. Tavares' medication included Depakote, Risperdal, Congentin, and Thorazine (as needed).

7. In preparing this report, Dr. Wall presented Tavares with a number of hypothetical situations involving criminal trials. Based on his responses, Dr. Wall found that Tavares was competent because he was able to understand the character and consequences of the proceeding against him and was able to properly participate in his defense.

8. Specifically, MHRH relies on § 40.1–5.3–3(i)(3)(i), which provides that forensic commitment shall terminate when "the defendant is determined by the court to be competent[.]"

partment urges us to hold that the court below erred when it ruled that § 40.1–5.3–3(i)(3)(i) permits the exercise of judicial discretion to consider Tavares' special treatment needs. According to MHRH, as soon as the hearing justice accepted the stipulation of competency, Tavares' commitment to ESH should have terminated automatically under the plain language of § 40.1–5.3–3(i)(3)(i). MHRH further argues that, because this provision is clear and unambiguous, and does not conflict with other sections of the forensic statute, it was improper for the hearing justice to consider the rationale of the chapter as a whole. Additionally, MHRH contends that § 40.1–5.3–3(i)(3)(i) neither requires nor allows a judge to consider a defendant's continued competency to stand trial. Finally, MHRH claims that the hearing justice erred when he characterized its "Petition for Determination for Competency" as a "Petition for Transfer."

It is noteworthy that in October 2004, a Superior Court justice found that Tavares was not guilty by reason of insanity for the murder of Glen Hayes. As a result, Tavares no longer is committed to ESH pursuant to § 40.1–5.3–3, but is instead committed to that facility pursuant to a different section of the forensic statute.[9] Because of this development, this Court directed the parties to address whether the issues raised in MHRH's petition for certiorari had become moot.

## II

## Standard of Review

■■■ This Court applies *de novo* review to questions of statutory interpretation. *Webster v. Perrotta,* 774 A.2d 68, 75 (R.I.2001). Our ultimate goal when con-

struing a statute "is to give effect to the purpose of the act as intended by the Legislature." *Oliveira v. Lombardi,* 794 A.2d 453, 457 (R.I.2002) (quoting *Webster,* 774 A.2d at 75). "When a statute is clear and unambiguous, we adopt its plain and ordinary meaning." *Park v. Ford Motor Co.,* 844 A.2d 687, 692 (R.I.2004) (quoting *Direct Action for Rights and Equality v. Gannon,* 819 A.2d 651, 659 (R.I.2003)). "Statutory construction is a holistic enterprise, however." *Id.* We will not interpret a statute literally "when such a construction will lead to an absurd result or one at odds with the legislative intent." *Ellis v. Rhode Island Public Transit Authority,* 586 A.2d 1055, 1057 (R.I.1991). This is especially true when construing a statute that is remedial in nature, in which case we will construe the statute liberally to effectuate its purposes. *See Ayers–Schaffner v. Solomon,* 461 A.2d 396, 399 (R.I. 1983).

## III

## Analysis

### A. Mootness

■■■ Both Tavares and MHRH concede that the issue of whether the trial justice erred in ordering Tavares' commitment at ESH to continue after a judicial determination of competency has been rendered moot by his subsequent commitment to ESH under a different section of the forensic statute. Although the parties agree that the correct interpretation of § 40.1–5.3–3(i)(3)(i) is moot as to Tavares, they contend that this is an issue of great public importance that is capable of repetition yet likely to evade review, and therefore that it should be resolved by this Court. We agree.

---

9. Section 40.1–5.3–4 of the forensic statute provides for commitment of persons who are    acquitted on ground of insanity.

■ "This Court has consistently held that a case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence*, 754 A.2d 89, 90 (R.I.2000) (citing *Sullivan v. Chafee*, 703 A.2d 748, 753 (R.I. 1997)). Although it is not the role of this Court to consider "moot, abstract, academic, or hypothetical questions," this rule is not absolute. *In re Stephanie B.*, 826 A.2d 985, 989 (R.I.2003) (citing *Morris v. D'Amario*, 416 A.2d 137, 139 (R.I.1980)). An exception exists when the issue before this Court is one of great public importance that, although technically moot, is capable of repetition yet evading our review. *In re Paula G.*, 672 A.2d 872, 874 (R.I.1996). We agree with the parties that this issue, although moot with respect to Tavares, presents an issue of great importance that warrants our review at this time.

## B. Overview of Forensic Commitment

Before we delve into the parties' dispute about whether the forensic statute prohibits the exercise of judicial discretion to order a competent defendant to remain committed at the forensic unit, we believe it is helpful to first provide an overview of Rhode Island's forensic statute. The statute, as set forth in chapter 5.3 of title 40.1, has general provisions that apply to all individuals who are committed pursuant to it. For example, § 40.1–5.3–1(a) requires that the director of MHRH establish a facility to provide "proper care, treatment, and restraint" for such individuals. Section 40.1–5.3–13 sets forth a non-exhaustive list of "general rights" that apply to all committed patients, and § 40.1–5.3–14 provides that persons being committed or transferred to a facility under the forensic statute have a right to receive care that is appropriate, necessary, and based on individual needs.

Other sections of the forensic statute provide for specific categories of commitment. Section 40.1–5.3–4 addresses those acquitted of a criminal charge on grounds of insanity. Sections 40.1–5.3–6 through 40.1–5.3–9 apply to those who are sentenced to prison but require special care related to their mental illness.

The section directly at issue in the present action, § 40.1–5.3–3, entitled "Competency to stand trial," contains a series of parts and subparts that shepherd the courts, criminal defendants, and the director of MHRH through a series of steps that apply when a person's competency to stand trial is at issue. For instance, § 40.1–5.3–3(c) allows counsel for the defendant or the state to request that the defendant be examined for the limited purpose of determining whether he or she is competent. The court may act on its own motion in this regard as well. If the examining physician believes that the defendant is incompetent, and the defendant currently is confined to the ACI, he or she immediately is transferred to the forensic unit to await a competency hearing. Section 40.1–5.3–3(d)(3). At this hearing, § 40.1–5.3–3(g) requires the court to determine whether the defendant is competent. If the court finds that the defendant is incompetent, he or she is committed to the custody of MHRH and evaluated to determine whether he or she poses a danger to himself or herself or the public, and whether competency will be restored within the maximum time allowed under the statute. Section 40.1–5.3–3(h)(2). If the defendant is dangerous, as was the case with Tavares, he or she is committed to the forensic unit for competency restoration. Section 40.1–5.3–3(i)(3).

After an incompetent defendant has been committed to the forensic unit, the director of MHRH is required to petition the court to review his or her competency every six months, or sooner if the director believes that the defendant's competency has been restored. Section 40.1–5.3–3(k). Upon receipt of the director's petition, the court must hold a hearing to evaluate the defendant's competency and prognosis. Section 40.1–5.3–3(m).[10]

When a person is committed to the forensic unit because he or she is incompetent to stand trial, § 40.1–5.3–3(i)(3) outlines the circumstances under which the commitment will terminate. The relevant language provides:

> "The commitment ordered pursuant to this section *shall terminate* upon the occurrence of any of the following:
>
> (i) *The defendant is determined by the court to be competent;* or
>
> (ii) The charges against the defendant are dismissed pursuant to subsection (j); or
>
> (iii) The charges against the defendant are dismissed or a nolle prosequi is entered; or
>
> (iv) The defendant is civilly committed pursuant to § 40.1–5–8; or
>
> (v) The court finds there is no reasonable likelihood that in the foreseeable future the defendant will become competent and his or her condition is such that he or she cannot properly be committed under § 40.1–5–8." Section 40.1–5.3–3(i)(3) (Emphases added.)

■ The key question before us is whether this provision forecloses discretion to a hearing justice after a finding of competency to stand trial, especially in light of the Legislature's use of the imperative word "shall." Tavares argues that the forensic commitment statute is remedial in nature, and therefore calls for a liberal construction to effectuate its purposes. MHRH counters, however, that because § 40.1–5.3–3(i)(3)(i) unambiguously states that a defendant's commitment "shall terminate," the hearing justice did not have discretion to order anything but an end to the commitment. According to MHRH, in the absence of ambiguity, the justice should have applied the words of this provision as written.

We agree with MHRH to the limited extent that the words "commitment * * * shall terminate" are unambiguous. However, we do not agree that this provision, a subpart within one subsection of the forensic statute, is dispositive of the case at bar. To apply these words literally, without consideration of the section or the statute as a whole, would frustrate legislative intent[11] and reach an absurd result. *See Krikorian v. Rhode Island Department of Human Services*, 606 A.2d 671, 675 (R.I. 1992) (Court views statute in its entirety to ascertain legislative intent); *Town of Scituate v. O'Rourke*, 103 R.I. 499, 507, 239 A.2d 176, 181 (1968) (Court does not apply literal reading of statute when doing so defeats or frustrates legislative intent).

## C. Legislative Intent

To ascertain the legislative intent of § 40.1–5.3–3, we need not look very far. The disputed language of § 40.1–5.3–3(i)(3)(i) appears under § 40.1–5.3–3's broader heading "Competency to stand tri-

---

10. As noted above, this hearing did not take place in Tavares' case because the parties stipulated to his competency.

11. As we discuss hereinafter, we have not ascertained the legislative intent in a subjec-

tive manner. Rather, we have ascertained that intent by considering what the General Assembly actually wrote in various parts of the overall legislative scheme.

al." As outlined above, this section provides for a series of procedures, evaluations, and hearings designed to ensure that criminal defendants are competent to stand trial. It therefore serves the dual purposes of protecting a criminal defendant's right to be competent during his or her trial, while also serving the public's interest in prosecuting crimes.

These remedial goals are brought into clear focus when we review the forensic statute as a whole. As discussed above, § 40.1–5.3–1 requires MHRH to maintain a facility that provides "proper care and treatment" of all persons committed to the department, and § 40.1–5.3–13 through § 40.1–5.3–14 respectively set forth a list of general rights for patients, including the right to an individualized treatment plan.

Focusing our attention on § 40.1–5.3–3(i)(3)(i), the subsection in dispute, it is evident that this too serves a remedial purpose. Section § 40.1–5.3–3(i)(3) outlines circumstances under which a defendant's forensic commitment terminates. One such circumstance, as noted above, is a judicial determination that the defendant's competency has been restored. MHRH argues, and we agree, that this provision protects the liberty interests of defendants by ensuring that they are not held indefinitely when they may otherwise be released on bail or treated in a less restrictive environment. MHRH further contends that this provision is intended to prevent a drain on its resources. But, even if this is the case, it is apparent that this concern is merely incidental to the statutory framework's paramount goal of protecting rights of the accused.

Because we believe the legislative scheme to be remedial in nature, we construe it liberally to effectuate its purposes. *Ayers–Schaffner,* 461 A.2d at 399. In our opinion, the Legislature intended that incompetent defendants be treated so that competency would be restored, and that competent defendants would be tried. It is crystal clear from the record that there was ample evidence to support the hearing justice's finding that Tavares' competence would be fleeting without the specialized treatment he was receiving at ESH, and that his remand to the ACI would cause him to decompensate to such a degree that he would be unable to retain his competency and proceed to trial. Such a result would, in our opinion, frustrate the intent of the Legislature and be manifestly unfair to Tavares, the people of the state, and to the victim's family.

### D. Judicial Responsibility to Ensure Competency

■ Competency, as defined by the forensic statute, requires something more than just a momentary condition. Section 40.1–5.3–3(a)(2) explains that a person is competent to stand trial "if he or she is able to understand the character and consequences of the proceedings against him or her and is able properly to assist in his or her defense[.]" This definition is consistent with the jurisprudence of both this Court and United States Supreme Court. *See State v. Martinez,* 651 A.2d 1189, 1193 (R.I.1994) (applying competency standard as defined by forensic statute); *State v. Cook,* 104 R.I. 442, 447, 244 A.2d 833, 835–36 (1968) (competency requires ability to understand charges, an understanding of the purpose and object of the proceedings, and a mental capacity to assist counsel in preparing and putting forth defense); *see also Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam) (test of competency is "whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him"). The requirement that

a person be able to "assist" in his or her defense means that a defendant cannot simply be competent when the trial commences. Rather, the ability to assist in one's defense requires a mental condition that *continues through all stages of a trial.*

■■■■ Judicial responsibility to ensure that a defendant is competent throughout the entire trial is not a novel idea. As the Supreme Court stated in *Drope v. Missouri*, 420 U.S. 162, 181, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." This well-established principle of law is reflected throughout the competency statute. Section 40.1-5.3-3(c) vests the court with authority to raise the issue of competency on its own motion "at any time during a criminal proceeding." Moreover, whenever the issue of competency arises, it is the judge who makes a final determination about the defendant's condition.

We recognize that in certain situations, the requirement that a person remain competent during all stages of his or her trial may seem at odds with the mandatory discharge provision in § 40.1-5.3-3(i)(3)(i). To harmonize these potentially conflicting requirements in a manner that is consistent with the statute's objectives, it is necessary for judges to be vested with discretion to consider whether a defendant's commitment should continue despite a judge's finding of competency. *See Billington v. Fairmount Foundry*, 724 A.2d 1012, 1013–14 (R.I.1999) (Court must harmonize conflicting provisions of statute in a manner consistent with legislative intent). To construe § 40.1-5.3-3(i)(3)(i) as foreclosing judicial discretion would thwart the Legislature's dual intent of ensuring that defendants are competent and that the state is given the opportunity to prosecute them for their alleged crimes.

■■■■ MHRH argues that "restoration of competency never comes with a guarantee," and that judges who are concerned about a defendant's future competency may be tempted to order commitment beyond a finding of competency based on "amateur clinical assessment and unfounded speculation." We agree that competency does not come with any guarantees, but we disagree that such judicial assessments are "amateur." On the contrary, competency is a *legal* condition, not a medical condition, and therefore it is well within the province of the court. *See* § 40.1-5.3-3(g) ("court shall decide" whether defendant is competent); § 40.1-5.3-3(i)(3)(i) (termination of commitment requires finding of competency "by the court"); § 40.1-5.3-3(m) ("court shall make a finding as to the defendant's competency"). While judges may rely heavily upon the advice of mental health professionals in assessing a defendant's competency, it is the judge, not the mental health professionals, who must make the final call and who bears the weight of the final decision on his or her shoulders. It is therefore reasonable for judges, charged with the responsibility of ensuring a defendant's competency, to make *legal* assessments about whether a defendant's competency is likely to continue during his or her trial.

Under MHRH's extremely literal reading of § 40.1-5.3-3(i)(3)(i), however, a judge would be precluded from considering whether a currently competent defendant is likely to decompensate during trial. In petitioner's view, the hearing justice is prohibited from proactively taking necessary steps to prevent a mentally fragile defendant from decompensating. Instead, he must ignore his legitimate concerns regarding the defendant's competency until a defendant no longer is competent. This

formalistic approach not only would frustrate legislative intent, it also would lead to an absurd result. *See Kaya v. Partington*, 681 A.2d 256, 261 (R.I.1996) (stating that "[t]his [C]ourt will not construe a statute to reach an absurd result"). Assuming competency could be restored, judges would be left with the daunting, if not impossible, task of trying to determine at what point during the criminal proceeding the defendant's competency had faded. *See Pate v. Robinson*, 383 U.S. 375, 387, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (noting difficulty presented by post hoc determinations of competency) (citing *Dusky*, 362 U.S. at 402, 80 S.Ct. 788). Judges (and likely this Court) would be faced with the complicated question of whether to start the trial anew or simply resume where it left off. Either scenario inevitably would threaten the economy of justice and waste resources of the parties, the courts, and ESH alike.[12]

Given § 40.1–5.3–3's remedial goal of obtaining and retaining competency, we cannot agree with MHRH's strict interpretation of the forensic commitment statute because, in some cases, such as the matter before us, prohibiting judicial discretion would lead to absurd results and be contrary to legislative intent. Everyone with an interest in this case—the state, Tavares, and the family of Glen Hayes—had an interest in seeing Tavares tried for his crimes. We are loath to tie hearing justices' hands by precluding them, in proper cases, from taking steps to ensure a defendant's competency; indeed, to do so would frustrate the purposes of a comprehensive legislative scheme.

 In light of the severity of Tavares' condition and the legislative intent of § 40.1–5.3–3, we believe it was consistent with Tavares' rights, the interests of the state and the interests of the victim's family, as well as the overall interests of justice, for the trial justice to order Tavares' forensic commitment. The trial justice's decision was based on a finding that Tavares' competency was fragile and conditioned upon his continued care at ESH. The record satisfies us that the hearing justice was correct in his finding and exercised his discretion properly.

## IV

### Conclusion

For the reasons set forth herein, the order is affirmed, and the papers in the case are remanded to the Superior Court.

---

**12.** For an extensive discussion of some of the practical and constitutional issues that arise when a defendant becomes incompetent after criminal proceedings have begun, see James Fife, *Restarting Criminal Proceedings After Restoration of Defendant's Competence*, 27 T. Jefferson L. Rev. 93 (2004). This Court is particularly mindful of the due process concerns that might arise if a defendant bounced back and forth between competency and incompetency, or if the defendant's newfound competency was threatened by the conditions of his or her confinement. However, because the forensic statute does not prohibit judges from exercising discretion to safeguard a defendant's competence, we need not address these constitutional concerns. *See Amico's Inc. v. Mattos*, 789 A.2d 899, 909 (R.I.2002) (Court will not decide case on constitutional grounds when other grounds exist).