DECISION
On December 13, 2005, the Town of Richmond Planning Board (the Board), sitting in its capacity as the Local Review Board for Comprehensive Permit Review, issued a written Decision concerning an Application for Master Plan approval submitted by Appellee Women's Development Corporation (WDC). WDC appealed to the Rhode Island State Housing Appeals Board (SHAB), which vacated the decision and remanded the matter back to the Board for further proceedings.[1] Thereafter, Appellant Attorney Cynthia M. Gifford (Appellant), pro se, filed this timely appeal.[2] Jurisdiction is pursuant to G.L. 1956 § 45-53-5.
 I Facts and Travel
WDC is a Rhode Island nonprofit corporation that designs, develops and produces *Page 2 
affordable housing for families, the elderly, and groups with special needs. See WDC Brochure at 1, and Letter to Town Planner dated May 24, 2005 (Letter), at 1. WDC is the sole member of Altamonte Ridge, LLC (Altamonte). Id. Altamonte owns property on West Shannock Road in Richmond, Rhode Island (the Town). Said property is adjacent to historic Shannock Village and is the subject of this litigation.
On May 24, 2005, WDC filed a Comprehensive Permit Application (CPA) with the Board seeking permission to develop affordable housing on the Altamonte property. In its December 14, 2005 written Decision, the Board succinctly described the project as follows:
 "1. . . . The proposed project originally consisted of 53 units on 35 lots. In a revision to the proposed site plans . . . the Applicant reduced the number of lots by two to 33. The project currently consists of 53 units on 33 lots.
 2. The property on which the project is proposed is located in an R-2 zone, as shown on Assessor's Plat 10D, Lot 46. The property contains approximately 63.74 acres, the majority of which is wooded, with some open fields. A small wetland is located midway into the site. This wetland includes a 50' perimeter area. A small pond is located midway along the easterly property line. Just beyond the easterly property line is another pond and stream. The stream has a 100' buffer that crosses into the property. The site is presently vacant land, bordered by residential development on the west, south and east. The site is located at a significantly higher grade than the surrounding residential development.
 3. The application, as originally described in the plans, was for 53 dwelling units to be built in 35 structures. The project as proposed in the application contained 8 one bedroom units, 24 two bedroom units, 11 three bedroom units and 10 four bedroom units.[3] During the process, the Applicant revised the number of lots and structures to 33. The number of units requested by the Applicant did not change when the Applicant reduced the number of lots.
 4. Access to the site is singularly available by way of a new roadway which will intersect West Shannock Road, near the intersection of Shannock Village Road. The section of West Shannock Road which will intersect the new roadway is 22' wide with a posted speed limit of 25mph. There are approximately 29 *Page 3 
residential structures abutting the [A]pplicant's site on West Shannock Road and approximately another 15 residential structures abutting the site along Shannock Village Road.
 5. The Applicant proposes to install community conventional sewage disposal fields on site. Each dwelling unit is proposed to have an individual septic tank, with the potential for pumps to be employed to lift the sewage to the on-site disposal fields. The Applicant proposes to provide drinking water through shared private wells." Decision on Comprehensive Permit Application at 2-3 (Board's Decision).
The proposed housing units, and accompanying roadways, would be located upon approximately fourteen acres of the property. SeeAttachment to CPA at 1. The remaining acres would be divided into shared, common open space (almost thirteen acres), and an open-space defeasible easement (over thirty six and one-half acres). Id. Each unit would be owner occupied and, for a period of ninety-nine years, the units would be deed restricted to purchasers with incomes below 120% of median income. Id.
On July 5, 2005, the CPA was certified as complete. Thereafter, the Board conducted a duly noticed public hearing on July 20, 2005. The hearing was continued to September 7, 2005, and then to October 5, 2005. The Board then closed the hearing and held discussion sessions on October 11, 2005, and October 27, 2005. During the discussion sessions, certain issues were raised that caused the Board to re-open the hearing without objection. The additional hearing dates were November 17, 2005, and December 8, 2005. The Board again closed the hearing. Another discussion session was conducted on December 13, 2005, and the Board then issued its Decision.
At the hearing, nine witnesses testified on behalf of WDC. The first witness to testify was WDC vice president and licensed architect Susan Aitcheson. Transcript dated July 20, 2005, at 10-23 (Tr. I). Ms. Aitcheson testified that since its founding in 1979, WDC has built over 1500 units for families, special needs groups, and the elderly.Id. at 12. She stated that the *Page 4 
proposed units would have a "traditional neighborhood design with smart growth concept[,]" and would follow the Town's conservation guidelines.Id. at 13. The homes would consist primarily of Capes and Colonials, with a "variety of exterior detailing to reflect the Victorian and Federal style homes of Richmond and Rhode Island." Id. at 17. Ms. Aitcheson further testified that WDC has attempted to cooperate with the immediate neighbors in order to address their various concerns.Id. at 18-19.
The housing development would be operated by a homeowners' association, with the support of WDC's property management company, for the life of the development. Id. at 12 and 21. WDC would provide training and workshops for purchasers in order to ease their transition into homeownership. Id. Over sixty percent of the site would be dedicated to "a large conservation area of open space[,]" and that "[i]n order to make it a walkable neighborhood we're proposing to build compact lots." Id. at 16-17.
Expert planner Joseph Lombardo then testified. Id. at 25. Mr. Lombardo, who also is a real estate agent, testified that the Town is 7.49% below the 10% state-mandated affordable housing requirement for cities and towns. Id. Accordingly, he stated that there is a demonstrable need for affordable housing in the Town. Id. at 27 and 31. Mr. Lombardo further testified that the engineering and design of the project appear sound, and that the need for such housing overrides any apprehensions that the Board may have concerning all of the requested waivers. Id. at 41-42.
Mr. Lombardo then discussed the financial impact that the development would have on the school district. Id. at 32-40. He estimated that the project would add nineteen school-age children to the Town.Id. at 34. After subtracting the project's anticipated tax revenues from its anticipated cost of schooling and municipal services, Mr. Lombardo estimated that the *Page 5 
development's annual net cost to the Town would be approximately $174,955. He later testified that WDC's reconfiguration of some of the units into duplexes would reduce the estimated number of school-age children residing in the development from nineteen to sixteen.Transcript dated September 7, 2005, at 18-19 (Tr. II). According to Mr. Lombardo, the reduction in estimated school-age children would lessen the annual net cost to the Town by $30,000. Id.
Certified real estate appraiser Robert Ryan next testified. Tr. I at 43. He opined that the proposed development would not conflict with the comprehensive plan, and that its exterior appearance would not clash with Shannock Village. Id. at 48. Mr. Ryan further testified that based upon his research, the project would not adversely affect neighborhood health, safety and morals, and that sales comparisons show "absolutely no adverse impact on property values from the presence of owner occupied affordable housing." Id. at 52.
The next witness was Karen Beck?a registered landscape architect and wetlands biologist. She stated that she had studied the soil and topography in order to determine whether the development would have an adverse impact on the site. Id. at 63. She testified that as a conservation development, "[i]t tries to avoid wetlands and other sensitive features, and it kind of clusters things into a smaller land area. . . ." Ms. Beck further testified that the houses are "designed to look like traditional New England and Shannock Style Housing."Id. at 75. She also stated that the common areas would incorporate a children's play ground, a gazebo, and a picnic area, and that the common areas would be open to the general public. Id. at 76. Ms. Beck then opined that the project would have no negative environmental impact, because it "has been designed with the public's health, safety and welfare in mind. . . ." Id. at 82. Later, she stated that each duplex would have two parking spaces on each side of the property. Tr. II at 15.
Project engineer Linda Layer testified that with respect to conservation developments, *Page 6 
"we're actually encouraged to modify lot size, shape, and other dimensional characteristics in order to provide open space. . . ."Tr. I at 85. She then listed the specific waivers that WDC needed to fulfill its plans. Id. at 87-93. On the issue of drainage, Ms. Layer testified that WDC plans to provide a "closed system collection system," whereby water would be collected at low-lying areas in the development, and then piped into a retention basin. Id. at 93. Each building would have a septic system that would pre-treat the sewage before it flowed, via gravity pipes, to a low point on site. Id. at 95. At that point, the treated sewage would be pumped up into a common field. Id. Ms. Layer also testified that the development provides adequate physical access to the street. Id. at 101.
Project architect Paul Selnau then testified. He said that great care was taken in planning a variety of architectural styles, and that not only would all of the structures be consistent with local codes, but that they also would be energy compliant. Id. at 106 and 108. In addition, he stated that all of the buildings would have a central entrance so that they would appear to be single-family homes from the street. Id. at 108-09.
Thereafter, traffic expert Anthony Winiarski testified. He stated that he used federal highway capacity software to conduct a traffic-impact study of two nearby intersections, and he concluded that both have existing levels of service A. Id. at 119-21.[4] He then concluded that the intersections would remain at levels of service A, even with the anticipated increase in traffic from the proposed development.Id. at 121.
Mr. Winiarski observed that the access roadway to the development would be located on a fairly significant curve with vegetation on both sides. Id. at 123. He proposed the placement of a stop sign at the roadway's egress, and the clearance of the vegetation on both sides to *Page 7 
mitigate sight distance problems. Id. He also proposed installing a light to illuminate the new intersection, "in the interest of safety."Id. at 125. Mr. Winiarski concluded that the "project can be completed and not have any adverse effects on traffic, health or safety for the people of the neighborhood if it's built." Id. at 128. Mr. Winiarski later essentially stated that although the relocation of a neighbor's wall would increase sight distance, if WDC is unable to garner that neighbor's cooperation, it should not prove fatal to WDC's application.Tr. II at 22-24. A report from Town's traffic consultant, Gordon R. Archibold Incorporated, generally was in agreement with Mr. Winiarski's findings and conclusions; namely, that while certain roadway improvements would be desirable, failure to make such changes should not preclude approval of the Master Plan. Id. at 23.
Brown University Professor Dr. Dennis Michaud, Ph.D., then testified.Id. at 29. Dr. Michaud is an economic consultant who had been engaged by WDC to analyze the economic and financial viability of the proposed development. Id. at 28. The record reveals that Dr. Michaud previously had been a real estate broker, a real estate developer, a mortgage broker, a licensed contractor, chief financial officer for a real estate developer, and an advisor to the Brown University Real Estate Club.Id. at 27.
Dr. Michaud testified that he conducted a break-even analysis of the project. Id. at 29. In doing so, he first calculated the fixed costs of the development, and he then calculated the number of units that would be required to absorb those fixed costs. Id. He stated that WDC's goal is to sell each unit at, or slightly below, cost. Id. at 30. After taking projected donations into account, Dr. Michaud testified that the break-even cost of the project would be fifty-three units. Id. at 30-31. If, however, WDC proved unable to obtain the projected donations, then the break-even point would rise to fifty-eight units. Id. Dr. Michaud then concluded: *Page 8 
 "Well, the bottom line is, in this project, was that we feel that without, unless the 53 are projected, this thing were approved, this thing is not economically feasible, because we are relying on donor money and this project being done slightly below cost." Id. at 33.
When asked what he believed the effect of an approval for less that fifty-three units would have on the development, Dr. Michaud replied: "Honestly, I doubt it could be built if the units went below 53. Because, already I'm figuring it takes 58 on a pure economic basis to break even without donor money." Id. at 33-34. At that point, Board Member Nancy Hess questioned Dr. Michaud about some of the expenses listed in his report. He responded: "Honestly, I think this budget is really tight. I don't think there's any fluff in here." Id. at 38.
Various neighborhood residents also appeared before the Board to express their concerns about the proposed development. The Appellant submitted a letter signed by one hundred neighbors, wherein they expressed unease about the density and design of the proposal.Id. at 67-68. The Appellant stated that designating the project as a conservation development was incorrect. Id. at 71. She noted that the CPA acknowledged that the property is substandard and that only twenty-two units lawfully could be built without zoning approval.Id. According to Appellant, multiplication of that amount by 1.15%, as required by the Conservation Ordinance for the Town, would result in only twenty-five permitted units, not fifty-three units, as WDC has requested. Id.
The Appellant also expressed concerns about the lack of public facilities and whether the water system would be capable of supporting the development. Id. at 76. She then questioned the estimated number of children that the project would bring into the neighborhood.Id. at 77. She stated "You know, I just don't trust the data approach."Id.
Another neighbor, Sanford Neuschatz, was concerned that an increase in traffic from the development would affect roadway safety. Id. at 83. He stated that the project "just seems urban *Page 9 
to me. It doesn't seem rural to me. It just doesn't seem to fit."Id. at 86-87. Neighbor Leon Millis felt that vinyl siding on the proposed new houses would not be in keeping with Shannock Village.Id. at 87.
In an attempt to alleviate some of these concerns, Interim Town Planner Jonathon Reiner pointed out that the project merely was at the Master Plan level, and that WDC "still has to go through the preliminary planning stage and the final planning stage. Id. at 101-02. He stated that
 "[a]t the preliminary planning stage, that's where we start to see a lot of the real hard engineering data analysis on the storm water drainage, things along those lines. That's when the septic systems approval would be granted by DEM or denied by DEM, so this is definitely not our only bite of the apple. There will be an extensive review period, another set of public hearings just the same as we are going through now for the preliminary stage of this application." Id. at 102.
Town Council Member Henry Oppenheimer spoke on his own behalf, and he stated that he is a past president of the Washington County Regional Planning Commission. Id. at 103-04. He also stated that he simultaneously served on the Richmond Task Force, where he was selected to advise the State Housing Resource Commission on modifications to the State Comprehensive Plan. Id. at 103-04. He informed the Board that he previously has been qualified as an expert witness in Federal Court, and that he has a Ph.D., with a major in finances. Id. at 104.
Mr. Oppenheimer expressed concern that WDC did not have a marketing plan to attract current Town residents who are in need of affordable housing, and he requested that the Board require preference to be given to such residents. Id. at 105-06. He also stated that in his opinion, the project provides inadequate erosion controls. Id. at 108. Mr. Oppenheimer then challenged the fiscal impact statement, and he calculated that in his opinion, the development would generate a minimum of thirty-two school-age children which would increase the annual fiscal impact of the project by $152, 000. Id. at 109-11. *Page 10 
Neighbor Jeff Morleau then offered his comments to the Board.Id. at 113. He criticized the development as being poorly designed and poorly planned. Id. at 114. He also said that it is unclear whether the houses would have basements, and if not, he expressed concern that the owners would have nowhere to store such things as gardening equipment, and that "one of the biggest issues that surrounding communities have about affordable housing is that the places always look rundown."Id. at 117-18.
Adam Hill then appeared before the Board. Id. at 121. He told the Board that he had obtained a degree in wildlife biology and management from URI, and that he works in the Wetlands Permitting Program of the Rhode Island Department of Environmental Management. Id. at 121. Mr. Hill expressed concern about the impact the development would have on the ecosystem. Id. at 122. He particularly was concerned about the impact that the septic system and the draw-down from the wells would have on the wetlands. Id. at 125 and 127.
John Partyka stated that he owns an abutting seventy-four acre parcel of undeveloped land. Id. at 131. Mr. Partyka stated that "I feel that this development, in its entirety, would seriously devalue my property."Id. at 131. He also said that by farming his land, he is providing open space for the town, "[a]nd I hope the Board will take that into consideration and not be pressured by state and federal mandates for low-income housing." Id. at 133. Neighbor Gail Ross also worried that the development would devalue her property. Id. at 134. Numerous other neighbors mentioned that their main concerns were traffic, well water supply, and devaluation of their properties. Id. at 135-41.
Thereafter, the Board closed the hearing and a discussion ensued. A question arose as to whether the development's proposed roadway constituted a loop road or a dead-end street. Apparently, the Town's Zoning Ordinance only allows for the construction of twenty-five units *Page 11 
on a dead-end street.[5]
The hearing was re-opened on October 5, 2005, and civil engineer Kambiz Karbassi took the stand. Transcript dated October 5, 2005, at 10 (Tr. III). He opined that the development's roadway constituted a loop road. Id. He then told the Board that WDC was willing to provide two parallel entrances from the main road into the roadway to allay any concerns about emergency access into the development.[6] Id. at 11. Mr. Karbassi additionally stated that "it's a very safe road . . . [,]" and that would not have a negative impact on the health and safety of its residents. Id. at 13-14. A discussion then ensued about the relative safety of a loop road over a cul-de-sac in emergency situations. Thereafter, the hearing was adjourned.
On December 8, 2005, the Board once again reconvened. Board Member Phillip Damicis questioned counsel for WDC as to whether WDC had explored the economic feasibility of a less dense development.Transcript dated December 8, 2005, at 29-30 (Tr. IV). Mr. Damicis then referred to an alternative plan developed by Board Member Nancy Hess, which allegedly utilized the same figures presented by Economic Consulting, LLC.[7] Id. He stated that Ms. Hess concluded that "a 23-lot subdivision, having substantially less density configurations, is economically viable." Id. The alternative plan would consist of thirty-three units on twenty-three lots. WDC was unable to respond because no one from the corporation had seen the alternative plan.Id. Ms. Hess informed WDC that her plan was on file in the Town Hall.Id. at 31. *Page 12 
Mr. Damicis later criticized Dr. Michaud's economic analysis.Id. at 50. He stated that Dr. Michaud's calculation of fixed costs was flawed. Id. After the close of the evidence, and immediately prior to closure of the hearing, a hand-drawn sketch of the alternative plan, as well as the allegedly supporting economic analysis, were entered into the record as exhibits without any supporting testimony. Id. at 66. The Board agreed to supply copies of the documents to WDC by fax on the following day. Id.
On December 13, 2005, the Board issued a written decision granting WDC permission to build thirty-three units on twenty-three lots, rather than fifty-three units on thirty-three lots, as had been requested by WDC.Decision on Comprehensive Permit Application (Board's Decision), dated December 13, 2005, at 3. The Board stated that it "denies the proposed density of 53 units as being detrimental to the public health, safety and welfare[,]" because it would "irrevocably change the rural and historic character of Shannock Village in terms of density, traffic, noise health, safety and environment, as well as that on the site itself." Id. It then found the alternative layout and plan submitted by Ms. Hess to be more appropriate for the following reasons:
 • It offers a more compact design than the Applicant's proposal;
 • It will conserve more open land than the Applicant's proposal, especially the unique and sensitive features on site as identified by the Conservation Commission;
 • It will preserve historical and archeological resources better than the Applicant's proposal;
 • It will provide greater design flexibility and efficiency in the siting of the necessary infrastructure, including sewage disposal systems and drinking water than the Applicant's proposal;
 • It will reduce the length of the roads, the amount of paving required for the residential development, and the amount of maintenance by the Town to service the roads than the Applicant's proposal;
 • It will provide for a diversity of housing choices to accommodate a variety of age and income groups, especially low and moderate income persons, so that the population diversity of the community *Page 13 
may be maintained;
 • It will create more livable lots and require fewer waivers than the Applicant's proposal;
 • It will create a neighborhood with direct visual and physical access to open land in the form of open space;
 • It will create a neighborhood more appropriate in character with a rural village that already has a strong identity, The Shannock National Historic District;
 • It will provide a 100' buffer between the new development and existing development in Shannock Village. Board's Decision at 3-4.
The Board ordered "that the impact on the school district be metered" and that the thirty-three units, if developed, must "be constructed in three phases[.]" Id. at 8. Each phase would require separate preliminary and final plan approval. The Board also ordered WDC to record a conservation easement in favor of the Town for the entire perimeter buffer, and to dedicate all open space to the Town at the time it files for its first preliminary plan approval. Id. at 9. The Board further ordered that as part of the recommended off-site traffic improvements, WDC must reset/relocate a neighbor's "existing stone wall (with approval of the appropriate parties). . . ." Id. The Board rejected the fiscal impact study submitted by Joseph Lombardo, and ordered WDC submit a new study "BASED UPON LOCALLY COLLECTED RICHMOND INFORMATION. . . ."Id.
WDC timely appealed the Board's Decision to SHAB. The Appellant filed a Motion to Intervene. WDC objected, stating that Appellant had not shown, nor could she show, that she had been prejudiced by the Board's Decision; thus, it contended, Appellant had no grounds to intervene. After hearing arguments, SHAB granted Appellant's motion to intervene.
On July 27, 2006, SHAB conducted a hearing on WDC's appeal. At the conclusion of the hearing, SHAB vacated the Board's Decision and granted approval of the Master Plan, as amended. Thereafter, on October 5, 2006, SHAB issued a thirty-one page written Decision. *Page 14 
In its Decision, SHAB characterized the Board's Decision as a denial of the Master Plan Application, rather than an approval with conditions, because it had reduced the number of requested units by 38%. SHABDecision dated October 5, 2006, at 22. It also found that the Board erred in creating its own alternative plan and economic analysis, and erred in failing to give WDC an opportunity to examine or rebut the economic analysis. Id. at 23. SHAB further found that the Master Plan was consistent with the Town's Comprehensive Plan, and was designed to serve the needs of current and future residents in the area.Id. at 26. SHAB also found the Master Plan to be consistent with local needs. Id. In so finding, SHAB concluded that the density proposed by the WDC project would not unreasonably alter the character of the neighborhood. Id. at 28.
SHAB then found that the Board's Decision "overstates the nature of the traffic safety evidence presented before it." Id. SHAB further found that substantial evidence in the record demonstrates that [WDC] "carefully considered traffic safety concerns to ensure that no unreasonable risks are posed by its development[,]" and it concluded that WDC "clearly met its burden of proof" on this issue. Id. at 28-29. SHAB recognized that although all major developments have a fiscal impact on a municipality; "[n]onetheless, such analysis must be properly balanced against the State's overriding need to promote affordable housing, particularly in a municipality such as Richmond which is far below the statutory 10% threshold." Id. at 30. SHAB then concluded that "[r]egardless of whether Professor Oppenheimer or Mr. Lombardo provided a more realistic fiscal impact assessment, the Town must bear such reasonable fiscal costs to allow for the development of affordable housing within its boundaries. . . ." Id.
SHAB vacated the Board's Decision and approved WDC's Master Plan Application, as amended. Id. at 31. It then remanded the matter to the Board for preliminary and final review in *Page 15 
accordance with § 45-53-4. Id. Additional facts will be supplied as needed for the Analysis portion of this Decision.
 II Standard of Review
The Rhode Island Low and Moderate Income Housing Act confers appellate review jurisdiction over SHAB decisions on this Court. It provides in pertinent part:
 "The court shall not substitute its judgment for that of the state housing appeals board as to the weight of the evidence on questions of fact. The court may affirm the decision of the state housing appeals board or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the state housing appeal board by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." § 45-53-5(d).
Similar to its review of zoning board and administrative agency decisions, this Court employs a deferential standard when reviewing SHAB decisions. Town of Smithfield v. Churchill Banks Companies, LLC, No. 2005-66-M.P., slip op. at 3 (R.I. filed June 22, 2007). In doing so, however, "[t]he court is limited to an examination of the certified record to determine if there is any legally competent evidence therein to support the [SHAB's] decision." Barrington Sch. Comm. v. Rhode IslandState Labor Relations Bd., 608 A.2d 1126, 1138 (R.I. *Page 16 
1992). Furthermore, "[l]egally competent evidence is indicated by the presence of `some' or `any' evidence supporting [SHAB's] findings."Rhode Island Pub. Telecommunications Auth. v. Rhode Island State LaborRelations Bd., 650 A.2d 479, 485 (R.I. 1994).
Reviewing courts should uphold a decision in instances where administrators have acted within their authority. Goncalves v. NMUPension Trust, 818 A.2d 678, 683 (R.I. 2003) (citing Doyle v. PaulRevere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998));see also, Coleman v. Metropolitan Life Ins. Co., 919 F. Supp. 573, 580
(D.R.I. 1996). The Court, however, "may reverse or modify the agency's final decision if it is [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record."Environmental Scientific Corp. v. Durfee, 621 A.2d 200, 208 (R.I. 1993) (internal quotations omitted). Accordingly, a judicial officer may reverse an agency's findings "only in instances wherein the conclusions and the findings of fact are totally devoid of competent evidentiary support in the record, or from the reasonable inferences that might be drawn from such evidence." Bunch v. Board of Review, Rhode Island Dept.of Employment and Training, 690 A.2d 335, 337 (R.I. 1997) (internal citation and quotations omitted).
It is well established that a reviewing court may "affirm a ruling on grounds other than those stated by the lower-court judge." State v.Brown, 900 A.2d 1155, 1161 (R.I. 2006) (quoting State v. Nordstrom,529 A.2d 107, 111 (R.I. 1987)); see also Hagenberg v. Avedisian,879 A.2d 436, 443 (R.I. 2005) (recognizing that the Court "is free to decide a case on grounds other than those relied upon by the trial justice");United Lending Corp. v. City of Providence, 827 A.2d 626, (R.I. 2003) (same); Sobanski v. Donahue, 792 A.2d 57, 60 (R.I. 2002) (same);Ogden v. Rath, 755 A.2d 795, 798 (R.I. 2000) (same). *Page 17 
 III Analysis
The Appellant contends that SHAB erroneously characterized the Board's Decision as a denial, rather than an approval with modifications and that, as a result, SHAB applied an erroneous standard of review. She next maintains that SHAB erroneously failed to credit the Town with an affordable housing plan, while simultaneously criticizing the Board for not complying with its terms.[8] The Appellant also essentially contends that because WDC did not raise the issue of infeasibility before SHAB, it cannot raise it on appeal. Finally, she asserts that SHAB's deliberations were arbitrary and capricious.
In response, WDC maintains that Appellant lacks standing to file this appeal because she presented no evidence that her substantial rights had been prejudiced. It further contends that the Board's decision amounted to a denial, and that SHAB's analysis properly focused on the Master Plan. WDC also asserts that Appellant's contention — that WDC had the burden of proving the infeasibility of the Board's decision at the SHAB hearing — was erroneous. Lastly, WDC avers that the Board's design is inconsistent with the Town's Affordable Housing Plan.
1. Standing
WDC asserts that Appellant does not have standing to pursue this appeal. In support of this contention, WDC contends that pursuant to § 45-53-5(d) only those whose substantial rights have been prejudiced may appeal to the Superior Court. WDC avers that Appellant has not even claimed that the project prejudices any of her rights, much less any of her substantial rights.
Pursuant to § 45-53-4(a)(4)(i), "Upon issuance of a certificate of completeness for a *Page 18 
 comprehensive permit, the local review board shall immediately notify each local board, as applicable, of the filing of the application, by sending a copy to the local boards and to other parties entitled to notice of hearings on applications under the zoning ordinance and/or land development and subdivision regulations as applicable." (Emphasis added.)
Section 18.60.050(C) of the Zoning Ordinance for the Town of Richmond requires an applicant to give notice to everyone who owns property located within two hundred feet of the applicant's property.[9] It is undisputed that Appellant's property was within two hundred feet of WDC's property and that it was applying for waivers from the Zoning Ordinance. Consequently, Appellant was entitled to notice of WDC's application under the Moderate Income Housing Act. The question remains, however, as to whether she constituted an aggrieved party.
Section 45-53-4(a)(4)(x) provides: "Any person aggrieved by the issuance of an approval may appeal to the superior court within twenty (20) days of the issuance of the approval." While the Moderate Income Housing Act does not define an aggrieved person, the Zoning Enabling Act, however, does provide such a definition. It provides that
 "An aggrieved party, for purposes of this chapter, shall be: (i) Any person or persons or entity or entities who can demonstrate that their property will be injured by a decision of any officer or agency responsible for administering the zoning ordinance of a city or town; or
 (ii) Anyone requiring notice pursuant to this chapter." G.L. 1956 § 45-24-31((4) (emphasis added).
Considering that Appellant was entitled to notice of WDC's application, Appellant constitutes an aggrieved party as a matter of law; consequently, she had standing to intervene and *Page 19 
to file this appeal.[10] Consequently, she had standing both to intervene before SHAB and to file the instant appeal. See Kaveny v. Townof Cumberland Zoning Bd. of Review, 875 A.2d 1, 1 n. 1 (R.I. 2005) (acknowledging abutting landowners as aggrieved parties). To hold otherwise would create the absurd result of requiring notice be given to parties with no standing to participate in the proceedings. See Pastorev. Samson, 900 A.2d 1067, 1083 (R.I. 2006) (holding that the Court "cannot interpret a statute in a way that will lead to an absurd result"); In re Tavares, 885 A.2d 139, 146 (R.I. 2005) ("We will not interpret a statute literally when such a construction will lead to an absurd result or one at odds with the legislative intent.") (Internal quotations omitted.) The Court now will address the merits of the appeal.
2. The SHAB Decision
The Appellant asserts that the Board's Decision constituted an approval with conditions, and that SHAB applied the incorrect standard or review. She maintains that WDC had the burden of proving that the Board's conditions rendered the project infeasible, and she asserts that WDC failed to meet such burden.
WDC maintains the project essentially was rendered unbuildable because of the following requirements that the Board had placed on the project: (1) that the project be built in three phases, with each phase requiring a separate preliminary and final plan approval; (2) the relocation of a wall on property owned by an individual who is opposed to the project; and, (3) that WDC place a permanent easement over more than half of the property prior to WDC's receipt of preliminary plan approval.[11] *Page 20 
Section 45-53-6 governs the standard of review that SHAB must employ when hearing an appeal from the grant or denial of a special exception to build low and/or moderate income housing. Accordingly, SHAB must
 "determine whether: (i) in the case of the denial of an application, the decision of the local review board was consistent with an approved affordable housing plan, or if the town does not have an approved affordable housing plan, was reasonable and consistent with local needs; and (ii) in the case of an approval of an application with conditions and requirements imposed, whether those conditions and requirements make the construction or operation of the housing infeasible and whether those conditions and requirements are consistent with an approved affordable housing plan, or if the town does not have an approved affordable housing plan, are consistent with local needs." Section 45-53-6(b).[12]
If SHAB determines that a decision constituted a denial that was either not consistent with an approved affordable housing plan, or was not consistent with local needs, "it shall vacate *Page 21 
the decision and issue a decision and order approving the application, denying the application, or approving with various conditions consistent with local needs." Section 45-53-6(d). If, however, SHAB finds that a decision constituted an approval with conditions, and that the conditions rendered a project infeasible, and/or the conditions are inconsistent with an approved affordable housing plan or local needs, "it shall issue a decision and order, modifying or removing any condition or requirement so as to make the proposal no longer infeasible and/or consistent, and approving the application[.]" Id. However, even if infeasible,
 "Decisions or conditions and requirements imposed by a local review board that are consistent with approved affordable housing plans and/or with local needs shall not be vacated, modified, or removed by the appeals board notwithstanding that the decision or conditions and requirements have the effect of denying or making the applicant's proposal infeasible." Id.
A project is considered "infeasible" if the conditions attached to approval are so onerous as to "render it impossible to proceed without financial loss, within the limitations set by the subsidizing agency of government." Town of Coventry Zoning Bd. of Review v. OmniDevelopment Corp., 814 A.2d 889, 900 (R.I. 2003).[13] Furthermore,
 "It is incumbent upon the party challenging the zoning board decision to demonstrate to the satisfaction of SHAB that the conditions and requirements make it impossible for the developer to proceed without financial loss and there are no alternative measures or modifications that can be accomplished to render construction of the project viable and capable of success. This burden of proof necessarily entails full disclosure of the financial plans that underlay the project, including accurate cost projections and the anticipated price of the homes. Id.
Regardless of whether SHAB determines that a board's decision is a denial of the application, or an approval with conditions, at a minimum it must consider: *Page 22 
 "(1) The consistency of the decision to deny or condition the permit with the approved affordable housing plan and/or approved comprehensive plan;
 (2) The extent to which the community meets or plans to meet housing needs, as defined in an affordable housing plan, including, but not limited to, the ten percent (10%) goal for existing low and moderate income housing units as a proportion of year-round housing;
 (3) The consideration of the health and safety of existing residents;
 (4) The consideration of environmental protection; and
 (5) The extent to which the community applies local zoning ordinances and review procedures evenly on subsidized and unsubsidized housing applications alike." Section 45-53-6(c).
In the instant matter, SHAB concluded that the Board's Decision amounted to a denial of WDC's Master Plan. It then found that the Board's Decision: (1) was not consistent with the Town's need to achieve a minimum of 10% affordable housing; (2) the alternative plan was not consistent with the Town's Comprehensive Plan; (3) made unreasonable determinations with respect to health, safety, and environmental issues; and, (4) was inconsistent with local needs. SHAB further found that there was nothing in the record to support an inference that the Board treated subsidized and unsubsidized housing applications differently. SHAB vacated the Board's Decision and approved WDC's modified Master Plan Application or CPA.
As already noted, SHAB characterized the Board's Decision as a denial, rather than as an approval with conditions. This Court does not agree with SHAB's characterization; rather, it considers the Board's Decision as an approval with conditions. However, considering that SHAB adequately addressed the issue of feasibility, whether it characterized the Board's Decision as a denial, or as an approval with conditions, is of no consequence in this case.
In its Decision, SHAB stated that
 "the Planning Board makes the following bold and unsubstantiated claims regarding the economic feasibility of its alternative plan:
 [T]he Board disputes that alternative plans would not be *Page 23 
feasible since the testimony of the Applicant's economic consultant, Dennis Michaud, indicated that no other alternatives were given to him.
 In summary, the Board finds no condition imposed by this Board causes the Project to be infeasible, nor makes it impossible for the Applicant to proceed in building or operating this project without financial loss, and finds that current [funding] available to the Applicant does not result in infeasibility."
 . . . Notwithstanding its boldly stated conclusion, the Planning Board has not cited to sufficient evidence to justify its conclusion that WDC could feasibly construct the alternative proposal. In fact, the record evidence as presented by WDC through Dr. Michaud's testimony and supplemented by the Developer . . . supports a contrary conclusion. WDC submitted substantial and credible evidence clearly showing that developer requires at least fifty-three units in order to proceed with an economically feasible development." SHAB's Decision at 24. (Emphasis added.)
These findings are supported by competent and uncontradicted evidence in the record. As previously noted, economic consultant Dr. Michaud testified that he conducted a break-even analysis of the project, and he concluded that the pure economic break-even point would be fifty-eight units. However, he also opined that the break-even point could be reduced to fifty-three units with help from donor money. He further testified that the project would not be economically feasible if less than fifty-three units were approved.
In its Decision, the Board impliedly rejected Dr. Michaud's break-even analysis, stating "no other alternatives were given to him by the WDC for evaluation." Board's Decision at 8. However, it did not give any reasons for ignoring Dr. Michaud's break-even analysis. Instead, the Board summarily adopted the alternative plan developed by Ms. Hess and asserted that such a plan would not render the project infeasible.
Furthermore, despite Appellant's assertions to the contrary, WDC in fact did raise the issue of infeasibility before SHAB. WDC gave SHAB full disclosure of the financial plans, cost *Page 24 
projections, and anticipated home prices. Additionally, at the SHAB hearing, Counsel for WDC argued:
 "We also can't help but note that the conditions — the conditions that were put on us by the decision, were guaranteed, I feel to make sure we build zero units, not 33. Just a couple of items: They are requiring that we record a conservation easement of 100-foot buffer and more than half of the land to benefit the town before we apply for preliminary approval. So, essentially we have to give up the land if we go back to the [B]oard. We couldn't do that because we could never — if we were denied, we would not have a salable lot with half of the lot and a buffer given to the town.
 One of the other decisions was that we would have to go to this neighbor and convince the neighbor to relocate a stone wall on his property; and if we didn't, we are not allowed to build a single solitary unit. That was one of the more, that was a vocal opponent at the hearing, so I'm not too optimistic of that.
 [W]e are clearly concerned that the Town will improperly try to use the preliminary hearing as a mechanism to limit density. . . ." Transcript of SHAB Hearing, dated July 27, 2006, at 33-34 (SHAB Tr.)
Counsel for SHAB acknowledged that "the Developer is saying to [SHAB] that if you force us to live with the decision of 33, we can't build it, it's unfeasible [sic]." Id. at 73.
The undisputed evidence reveals that fifty-three units, with donor funding, constituted the break-even point of the project; consequently, the approval of only thirty-three units necessarily rendered the project infeasible because the cost of the project would far exceed its projected income. Although Ms. Hess and Mr. Damicis developed an alternative economic analysis, allegedly demonstrating the economic viability of a twenty-three lot subdivision containing thirty-three units, there is no evidence in the record to support such a finding.
Furthermore, considering that the alternative plan was entered into the record after the close of evidence, and without any supporting testimony, SHAB did not err in declaring that the *Page 25 
Board's findings on feasibility were bold and unsubstantiated. Consequently, SHAB did not err in rejecting the alternative plan. Nor did it err in finding that WDC required approval of fifty-three units for the project to be feasible.
By reversing the Board's decision and approving WDC's final Master Plan, SHAB removed the conditions imposed by the Board. It is clear to this Court that SHAB was persuaded both by the record evidence, and by WDC's arguments that the conditions imposed by the Board also rendered the project infeasible. Such conditions were impractical and unnecessary, and each had the very real potential of causing the project to fail.
The record reveals that both Mr. Archibold and Mr. Winiarski agreed that while moving an adjacent wall might be desirable, failure to do so should not preclude approval of the Master Plan. By requiring WDC to cause the relocation of a wall on an objector's private property, the Board gave that objector the means to sabotage the project simply by refusing to allow WDC to move said wall. SHAB's removal of this potentially infeasible causing condition did not constitute error.
The requirement that WDC dedicate over half of its property to open space without any guarantee that the project eventually would be approved was not necessary because WDC already had guaranteed that it would dedicate that land to open space as part of the overall project. A more reasonable condition would have been to require dedication of the land upon final approval of the plan, but before the commencement of construction. That is because, should WDC fail to secure final plan approval, the Board's condition would cause WDC to lose over half of its property to the Town, with nothing to show for it; consequently, SHAB did not err in removing this condition.
Finally, although Appellant is correct in arguing that phased development is not *Page 26 
uncommon for projects such as this one, the condition that the Board imposed went a step further. For each of the three phases, WDC would be required to seek separate preliminary and final plan approval. Thus, conceivably, WDC could receive approval for the first two phases, only to have the third phase disapproved. Such a scenario would render the project infeasible after the fact. Accordingly, it was not erroneous for SHAB to remove this condition.
The Appellant next asserts that SHAB's deliberations were arbitrary and capricious because it characterized the Board's Decision as an overly drastic alteration of WDC's application, while at the same time criticizing the Board's alternative plan as being similar to WDC's application. This assertion is without merit.
In their deliberations, SHAB members properly recognized that like WDC's Master Plan, the alternative plan also did not conform to the Zoning Ordinance requirement of low-to-intermediate density R2 development. SHAB Tr. at 115. Such an observation was not arbitrarily or capriciously inconsistent with SHAB's finding that the alternative plan was drastically different from WDC's Master Plan. Similar to WDC's Master Plan, the alternative plan also provided for a dense development on sites that would be less than two acres; however, the alternative plan drastically reduced the number of units by 38%, thereby rendering the project infeasible. Further, the Board imposed some very stringent conditions which likely would have the effect of dooming the project.
 IV Conclusion
After a thorough review of the entire record in this matter, this Court finds that SHAB's act of vacating the Board's Decision was not in violation of statutory and regulatory provisions, was not in excess of the authority granted to SHAB, and was not arbitrary and capricious. *Page 27 
SHAB's decision also was not affected by error of law and was not characterized by an abuse of discretion. Substantial rights of the Appellants have not been prejudiced. Consequently, and for the foregoing reasons, this Court upholds SHAB's Decision; albeit on different grounds.
Counsel shall submit an appropriate order consistent with this decision.
[1] Although the State Housing Appeals Board (SHAB) filed a memorandum to this Court, it declined any advocacy role with respect to the instant appeal.
[2] Initially, Appellee Women's Development Corporation (WDC) filed a motion to dismiss on the basis that the appeal is interlocutory pursuant to G.L. 1956 § 45-53-5; however, it since has informed this Court that it is no longer pursuing said motion.
[3] The proposed housing units would consist of twenty-one single-family homes, mostly with three bedrooms; twelve two-bedroom duplexes; and two fourplexes each with one-bedroom. Letter to TownPlanner dated May 24, 2005
[4] Mr. Winiarski testified that a level of service A "equates to having a delay of less than ten seconds when you get to the intersection." Transcript dated July 20, 2005, at 120-21.
[5] Article 13(B)(8) of the Richmond Land Development and Subdivision Regulations provides in pertinent part:
 "Dead end streets shall serve no more than 25 lots or dwelling units. Streets serving more than 25 lots or dwelling units shall be provided with a secondary access, which may be an `emergency' access of a design and location approved by the Planning Board. The Board may also permit more than 25 lots or dwelling units to be located on a dead end street if, in the opinion of the Board, there is a likelihood of a future street connection to adjoining streets or properties that would provide secondary access."
[6] WDC subsequently did submit such a plan.
[7] The allegedly supporting economic analysis was developed by Mr. Damicis and Ms. Hess.
[8] The record reveals that the Town approved an affordable housing plan on the same day that the Board issued its decision SHAB found that the Town did not have an affordable housing plan at the time WDC filed its original application.
[9] Specifically, section 18.60.050(C) of the Zoning Ordinance for the Town of Richmond provides in pertinent part:
 "An applicant for a variance, special use permit, or appeal shall send notice of the hearing . . . to:
 1. The owners of property within two hundred feet of the property that is the subject of the application. . . ."
[10] Rule 24(a) of the Superior Court Rules of Civil Procedure provides in pertinent part: "[u]pon timely application anyone shall be permitted to intervene in an action: (1) when a statute of this state confers an unconditional right to intervene. . . ." See also Caran v.Freda, 108 R.I. 748, 753, 279 A.2d 405, 408 (1971) (holding that "petitioners, as abutting property owners, have a special interest in the pending appeal.")
[11] The Appellant contends that because WDC did not argue that the project was infeasible when it appeared before SHAB, it should not now be allowed to argue that the Board's conditions "rendered the project unbuildable."
[12] "`Consistent with local needs' means reasonable in view of the state need for low and moderate income housing, considered with the number of low income persons in the city or town affected and the need to protect the health and safety of the occupants of the proposed housing or of the residence of the city or town, to promote better site and building design in relation to the surroundings, or to preserve open spaces, and if the local zoning or land use ordinances, requirements, and regulations are applied as equally as possible to both subsidized and unsubsidized housing. Local zoning and land use ordinances, requirements, or regulations are consistent with local needs when imposed by a city or town council after comprehensive hearing in a city or town where:
 (i) Low or moderate income housing exists which is: (A) in the case of an urban city or town which has at least 5,000 occupied year-round rental units and the units, as reported in the latest decennial census of the city or town, comprise twenty-five percent (25%) or more of the year-round housing units, is in excess of fifteen percent (15%) of the total occupied year-round rental units; or (B) in the case of all other cities or towns, is in excess of ten percent (10%) of the year-round housing units reported in the census.
 (ii) The city or town has promulgated zoning or land use ordinances, requirements, and regulations to implement a comprehensive plan which has been adopted and approved pursuant to chapters 22.2 and 22.3 of this title, and the housing element of the comprehensive plan provides for low and moderate income housing in excess of either ten percent (10%) of the year-round housing units or fifteen percent (15%) of the occupied year-round rental housing units as provided in subdivision (2)(i)." Section 45-53-3(2).
"Infeasible" is defined as:
 "any condition brought about by any single factor or combination of factors, as a result of limitations imposed on the development by conditions attached to the approval of the comprehensive permit, to the extent that it makes it impossible for a . . . nonprofit organization . . . to proceed in building or operating low or moderate income housing without financial loss, within the limitations set by the subsidizing agency of government, on the size or character of the development, on the amount or nature of the subsidy, or on the tenants, rentals, and income permissible, and without substantially changing the rent levels and unit sizes proposed by the public agency, nonprofit organization, or limited equity housing cooperative." Section 45-53-3(3).
[13] The definition of "impossible" is: "1. not possible; unable to be, exist, [or] happen, etc. 2. unable to be done." Random HouseUnabridged Dictionary, 962 (2nd ed. 1993).